[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON MOTION FOR RECONSIDERATION
In its Memorandum of Decision of December 29, 1989, this court granted the plaintiff and the class he represented a permanent injunction ordering the defendant City to provide emergency shelter to those homeless persons who request it. The court relied on 17-273 and 17-292 or the Connecticut General Statutes which required that each town "support" persons within the town who are in need.
In 1992, the legislature adopted Public Act 92-16 which revised 17-273, purportedly to limit the support towns must provide in accordance with other statutory sections enacted.
Public Act 92-16 provides in pertinent part, with amendments in block letters, as follows:
 (a) Each person who has not estate sufficient for his support, and has no relatives of sufficient ability who are obliged by law to support him, shall be provided for and supported TO THE EXTENT REQUIRED UNDER THE PROVISIONS OF THIS CHAPTER AND SECTION 17-3a at the expense of the town in which he resides, except as otherwise provided in this section, or, if he has no residence, of the town in which he becomes in need of aid, subject to the provisions of section 17-273b, subsection (1) of section 17-281a, and in accordance with section 17-292g except that in making a determination of liability for support under this section the income of a stepparent living in the same home as a dependent child of dependent children shall be considered in the same manner CT Page 11157 and to the same extent as under the aid to families with dependent children program pursuant to section 17-85.
. . .
 . . . A person who is a recipient of financial aid under chapter 302 OR OF SOCIAL SECURITY DISABILITY OR SUPPLEMENTAL SECURITY INCOME shall be considered to be provided for by the state [, pursuant to section 17-292a] OR FEDERAL GOVERNMENT. On and after the effective date of this act, no such person shall be eligible to receive general assistance financial or medical aid. No town shall be liable to supplement a recipient of financial aid under chapter 302 whose award has been reduced or suspended [,] or who has been penalized with a period of ineligibility, during such period of ineligibility. A person who is a recipient of medical aid under chapter 302 shall be considered to have his medical needs provided for by the state and no such person shall be eligible to receive general assistance medical aid.
. . .
 (c) Except as provided in sections 17-280 and 17-281, a person whose assets exceed two hundred fifty dollars shall not be eligible for assistance pursuant to this section or section 17-274. The commissioner of income maintenance may adopt. . .
. . .
 (e) ONLY PERSONS DOMICILED AND RESIDING IN CONNECTICUT OR WHO HAVE NO OTHER RESIDENCE, AND WHO ARE UNITED STATES CITIZENS OR WHO HAVE BEEN CT Page 11158 ADMITTED AS RESIDENTS INTO THE UNITED STATES SHALL BE ELIGIBLE FOR SUPPORT UNDER THE GENERAL ASSISTANCE PROGRAM.
 (f) NO PERSON WHO IS A SUBSTANCE ABUSER AND REFUSES OR FAILS TO ENTER AVAILABLE TREATMENT SHALL BE ELIGIBLE FOR FINANCIAL ASSISTANCE UNDER THE GENERAL ASSISTANCE PROGRAM UNTIL SUCH PERSON ENTERS TREATMENT.
 (g) A TOWN MAY PROVIDE ASSISTANCE ADDITIONAL TO THAT REQUIRED UNDER THE PROVISIONS OF THIS CHAPTER, NO SUCH ADDITIONAL ASSISTANCE SHALL BE CONSIDERED INCOME IN DETERMINING WHETHER A PERSON IS ELIGIBLE FOR ASSISTANCE UNDER THIS CHAPTER, ANY SUCH ADDITIONAL ASSISTANCE SHALL BE PAID BY THE TOWN WITHOUT ANY REIMBURSEMENT FROM THE STATE, EACH TOWN WHICH OFFERS SUCH ADDITIONAL ASSISTANCE SHALL NOTIFY THE COMMISSIONER OF THE ASSISTANCE TO BE PROVIDED AND THE ELIGIBILITY CRITERIA FOR SUCH ASSISTANCE.
. . .
 No assistance or care shall be given under this part to an employable person who has not registered with the nearest local employment agency of the labor department, has refused to accept a position for which he is fitted and which he is able to accept, or has refused to participate or wilfully failed to report for work in a work program or training or education program, pursuant to section 17-281a, by the town liable to support such person in accordance with sections 17-273 and 17-292. The provisions of this section shall not apply to any person who cannot register with such employment agency because of being over sixty-five years CT Page 11159 of age, health or other disability AS DETERMINED BY THE COMMISSIONER.
. . .
 (a) Any town may contract with a non-profit organization to provide emergency shelter services for [homeless] general assistance recipients. Without the authorization of the commissioner of income maintenance, emergency shelter services for a general assistance recipient shall not exceed fifty-six nights of residence per calendar year. Payments by towns for such services may be made on a quarterly lump sum basis and expenditures for such payments shall be deemed to be a cost reimbursable under section 17-292, AS AMENDED BY SECTION 12 OF THIS ACT, EXCEPT THAT NO TOWN SHALL BE LIABLE TO PAY FOR EMERGENCY SHELTER SERVICES FOR RECIPIENTS WHO FAIL TO VERIFY THEIR EFFORTS TO SECURE PERMANENT HOUSING. EMERGENCY SHELTER SERVICES SHALL BE PROVIDED ONLY TO THOSE RECIPIENTS WHO CANNOT REMAIN IN PERMANENT HOUSING BECAUSE (1) A JUDGMENT HAS BEEN ENTERED AGAINST THE RECIPIENT IN A SUMMARY PROCESS ACTION INSTITUTED PURSUANT TO CHAPTER 832, PROVIDED THE ACTION WAS NOT BASED ON CRIMINAL ACTIVITY, OR A JUDGMENT HAS BEEN ENTERED AGAINST THE RECIPIENT IN A FORECLOSURE ACTION PURSUANT TO CHAPTER 846 AND THE TIME LIMITED FOR REDEMPTION HAS PASSED; (2) THE RECIPIENT HAS LEFT TO ESCAPE DOMESTIC VIOLENCE; (3) A CATASTROPHIC EVENT, SUCH AS A FIRE OR FLOOD, HAS MADE THE PERMANENT HOUSING UNINHABITABLE OR THE RECIPIENT HAS BEEN ORDERED TO VACATE THE HOUSING BY A LOCAL CODE ENFORCEMENT OFFICIAL; (4) THE RECIPIENT SHARE AN APARTMENT WITH A PRIMARY TENANT WHO IS BEING EVICTED OR IS ENGAGED IN CRIMINAL CT Page 11160 ACTIVITY; (5) THE RECIPIENT WAS ILLEGALLY LOCKED OUT BY A LANDLORD AND HAS FILED A POLICE COMPLAINT CONCERNING SUCH LOCKOUT OR (6) THE RECIPIENT HAS BEEN LIVING WITH A TENANT WHO RECEIVED A PRELIMINARY NOTICE UNDER SECTION 47A-15 OR A NOTICE TO QUIT BECAUSE OF TERMINATION OF A RENTAL AGREEMENT FOR LAPSE OF TIME.
. . .
The defendants have filed a Motion to Reconsider which asks the court to reconsider the 1989 decision and injunction in light of the revision to 17-273. The parties filed briefs and in response to the defendants' motion, the plaintiffs urged the court to find that a constitutional right to shelter exists in Connecticut. This prayer for relief has been presented in the original proceeding but the court declined to address it in view of its determination that a right existed under the statutes mentioned above.
Because of its potential impact on the statute as amended, if a constitutional right to shelter exists, the court will address that issue first.
 I.
In State v. Geisler, 222 Conn. 672, 685 (1992), our Supreme Court set forth six "tools of analysis" which should be considered in construing "the contours of our state constitution." They are: 1) the textual approach; 2) holdings and dicta of the Supreme Court and the Appellate Court; 3) federal precedent; 4) sister state decisions or sibling approach; 5) the historical approach; 6) economic/sociological considerations.
There is no explicit right to shelter in the Connecticut Constitution but the plaintiffs argue such a fundamental right may be found in the preamble to the 1965 Constitution:
 The People of Connecticut acknowledging with gratitude, the good providence of God, in having permitted them to enjoy a free government; do, in order more effectually to define, secure, and CT Page 11161 perpetuate the liberties, rights and privileges which they have derived from their ancestors; hereby, after a careful consideration and revision, ordain and establish the following constitution and form of civil government.
This language has remained unchanged since the first Constitution was adopted in 1818.
The plaintiffs argue that shelter is one of the rights "derived from their ancestors." Support for this proposition was offered in the testimony of Christopher Collier, Connecticut State Historian. Testifying at the hearing on the permanent injunction, he related that since 1650 towns have supported their indigent under the mandate of 17-273 and its predecessors. This policy was stated by our Supreme Court in an early case in which a pauper sued for support the selectman of the town in which he had become a pauper. Referring to a forerunner of 17-273, the court stated:
 "It is the human purpose of our law in relation to the support of paupers, to prevent as far as possible any person, under any circumstances, from suffering from the necessaries of life." Trumbull v. Moss, 28 Conn. 253, 256 (1859).
Except for references to 17-273 and its predecessors, however, no Connecticut court has recognized as an implicit fundamental right the right to shelter.
Connecticut decisions have recognized implicit fundamental rights, including the right of a parent to raise his or her children, In re Alexander V., 223 Conn. 357 (1992); and the right to appeal the conviction of a crime, D'Amico v. Manson, 192 Conn. 144
(1984). Others have been mentioned in dicta. For example, the right to vote, the right to welfare and medical assistance, Leech v. Veterans' Bonus Division Appeal Bd., 179 Conn. 311
(1979), and in Robertson v. Apuzzio., 170 Conn. 367 (1976), "the right of an indigent to medical care."
However, our own courts have stated that there is no common law obligation to support paupers. State v. Bristol, 139 Conn. 469,471 (1953), citing Beacon Falls v. Seymour, 44 Conn. 210, CT Page 11162 214 (1876). Furthermore the state Constitution has been interpreted under a presumption that the Constitution is not intended to change the common law. 28 Op. Atty. Gen. 203-04 (1954), citing Cooley's Constitutional Limitations Co. 8th ed., Vol. 1, p. 133. Also, one circuit court judge has stated that there is no constitutional duty to support the poor. Williams v. Shapiro, 4 Conn. Cir. 449, 452 (1967) ("The plaintiff concedes, as indeed she must, that there is no constitutional or common law duty on the part of the state or any governmental unit to support poor and destitute persons.")
Christopher Collier, the state historian, testified in the 1989 proceeding that providing support for indigent persons was one of the rights and privileges provided by our ancestors, and that to determine whether the right to shelter was fundamental one must examine the historical setting and problems that the Constitution was drafted to correct. The Declaration of Rights was first adopted in 1650 and remained essentially the same until the first state Constitution was adopted in 1818. Christopher Collier, The Connecticut Declaration of Rights Before the Constitution of 1818: A Victim of Revolutionary Redefinition, 15 Conn. L. Rev. 87, 92 (1982).
The Declaration of Rights states that:
 [no] man's life shall be taken away; no man's honor or good name shall be stained; no man's person shall be arrested, restrained, banished, dismembered, nor any ways punished; no man shall be deprived of his wife or children; no man's goods or estate shall be taken away from him, nor any ways indamaged under colour of law, or countenance of authority; unless clearly warranted by the laws of this state.
Id., p. 92 n. 14. From this declaration it would appear that our ancestors were more concerned with protecting themselves from government interference than with defining benefits they would receive from the government.
When faced with these claims, Connecticut courts have been reluctant to address the issue of what rights are fundamental or to find new constitutional rights. In holding that the State was CT Page 11163 required to fund all medically necessary abortions for poor women and not just abortions which are necessary to protect the life of the mother, Judge Berdon stated:
 Of course, if the right to such medical care reached the level of being fundamental, and based upon the overwhelming weight of evidence that an abortion is the only appropriate medical treatment for these women. . . , failure to fund such medically necessary abortions would clearly and explicitly impinge on this constitutional right. The court, however, is not required to decide this issue in this case.
Doe v. Maher, 40 Conn. Sup. 394, 425 n. 33. In holding that a statute defining eligibility for Aid to Families with Dependent Children benefits did not create a right to state-provided housing, the Connecticut Supreme Court stated:
 We agree with the commissioner that establishment of the emergency housing program created no constitutional right to its continued existence on the ground that its discontinuance or a reduction in the period of its availability is likely to affect family living arrangements.
Savage v. Aronson, 214 Conn. 256, 286, 571 A.2d 696 (1990). In Doe v. Maher, supra, the court, in dicta, stated that:
 "although government may not place obstacles in the path of a woman's exercise of her freedom of choice, it need not remove those not of its own creation. Indigency falls into the latter category."
Doe v. Maher, supra, 428, quoting Harris v. McRae, 448 U.S. 297,316, 100 S.Ct. 2671, 65 L.Ed.2d 784, reh. denied, 448 U.S. 917,101 S.Ct. 39, 65 L.Ed.2d 1180 (1980). The court did note, however, that it was not required to follow Harris v. McRae, which was based on the federal constitution rather than the state CT Page 11164 Constitution. Id. 429. Subsequently, in Savage v. Aronson, supra, 284, the Connecticut Supreme Court stated that "[t]he financial circumstances of these plaintiffs, which are the root cause of their inability to obtain `permanent' homes, have not been produced by any state action, an essential requirement for invocation of the due process clauses of both our federal and state constitutions." (Citations omitted.)
 "In determining which rights are fundamental, judges are not left at large to decide cases in light of their personal and private notions. Rather, they must look to the `traditions and [collective] conscience of our people' to determine whether a principle is `so rooted [there] . . . as to be ranked as fundamental'"
Doe v. Maher, 40 Conn. Sup. 394, 424 (1986).
Until the adoption of Public Act 92-16, one could argue that the existence of 17-273, virtually unaltered since 1650, reflected the "collective conscience of our people" and was so rooted as to he fundamental.
However, in light of the drastic limitations imposed by the legislature, one is obliged to retreat from such a conclusion. Connecticut's conscience has undergone a revision in the face of budgetary concerns and it is no longer "the humane purpose of our law in relation to the support of paupers, to prevent as far as possible any person, under any circumstances, from suffering for the necessaries of life." Trumbull v. Moss, 1859, supra.
An examination of other jurisdictions provides no support for the conclusion that shelter is a fundamental right in Connecticut.
Research has revealed only one state with an explicit constitutional provision regarding support for indigent persons. The New York Constitution states: "The aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions, and in such manner and by such means, as the legislature may from time to time determine." N.Y. Const. Art. 17, 1. In California and New Jersey the right of support is based on existing statutes, not on the state CT Page 11165 Constitutions. See City and County of San Francisco v. Superior Court, 57 Cal.App.3d 44, 128 Cal.Rptr. 712, 714 (1976) (statute required city and county to "relieve and support all incompetent poor indigent persons. . ."); Williams v. Department of Human Services, 116 N.J. 102, 561 A.2d 244, 251 (1989) (New Jersey statute was enacted so that "person[s] may not suffer unnecessarily from cold, hunger, sickness or be deprived of shelter").
When one examines the underpinnings of two Connecticut Supreme Court statements of fundamental rights, even they are suspect.
The Connecticut Supreme Court based its statements that an indigent person has a right to welfare and medical care on two United States Supreme Court cases, Memorial Hospital v. Maricopa County, 415 U.S. 250, 94 S.CT. 1076, 39 L.Ed.2d 306 (1974), and Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600
(1969). A close reading of these cases, however, reveals that the holdings state only that when a state or county agrees to provide such services, it must do so fairly and cannot impose a residency requirement or waiting period on recipients. Memorial Hospital v. Maricopa County, supra, 261 (new residents must have same right to benefits as other residents); Shapiro v. Thompson, supra, 627. In neither case did the court address whether there was a fundamental right to receive such benefits. Memorial Hospital v. Maricopa County, supra, 252 n. 3 ("the question of the rights of transients to medical care is not presented by this case"); Shapiro v. Thompson, supra.
Although a federal court held that residents of a District of Columbia homeless shelter had a property interest in the continued occupancy of the shelter to invoke procedural safeguards before the city could close the shelter, the court stated that "[w]hatever the humanitarian or emotional considerations, the government assumes no obligation to house and feed indigent people." Williams v. Barry, 490 F. Sup. 941,944-45 (D.D.C. 1980). In Pennsylvania there is no constitutional right to receive public assistance. Kratzer v. Commissioner, Department of Public Welfare, 85 Pa. Commw. 318, 481 A.2d 1380
(1984).
Lacking explicit constitutional language, and with Public Act 92-16 decimating 17-273, any fundamental right to shelter in Connecticut would have to be found implicit in the preamble to CT Page 11166 the state Constitution. As was stated above, the Declaration of Rights, the predecessor of the state Constitution, indicates that the framers of the state Constitution were concerned more with protecting individuals from governmental interference than with establishing governmental obligations.
Further, the court is mindful of the Connecticut Supreme Court's holding in Savage v. Aronson, supra, that there is no constitutional right to the continued availability of emergency shelter.
Reluctantly, this court must conclude that in the Connecticut of 1992, there is no fundamental right to shelter.
 II.
The defendant City's position is that in view of the drastic revision of 17-273, this court's 1989 decision is invalid.
Public Act 92-16 does restrict town liability for the provision of emergency shelter to recipients of General Assistance Cash benefits who are homeless as a result of one of six reasons set forth in the Act.
However, without a Compliance Plan, ordered as part of the 1989 decision, the City had no system to determine who was using its shelters. In fact, while it accused nearby towns of "dumping" its homeless in New Haven, no records were available to support that claim and to form the basis for reimbursement from such offending towns.
In fact, the shelters operated on a "first come, first served" basis and even General Assistance recipients could be turned away once the facility was full.
Thus, a modified Compliance Plan would provide prompt eligibility determination, emergency shelter to all eligible recipients, and assistance to homeless recipients who cannot comply with the detailed eligibility process by virtue of physical or mental incapacity.
The defendants also argue that the enactment of a $250 asset limit in 17-273 (c) via Public Act 89-239, Sec. 1, had the effect of invalidating the court's decision. This enactment was not a limitation on a town's obligation to the poor but was intended to CT Page 11167 expand eligibility for General Assistance cash benefits. The amendment permitted one on General Assistance to possess $250, with that sum excluded from eligibility determination.
Nevertheless, this limitation has been incorporated into a proposed Compliance Plan and the court sees no reason why its enactment should invalidate the 1989 decision.
The court's ruling on the constitutional claim eliminates any need to address the remaining claims of the defendants regarding the 1991 legislation, Public Act 91-8, Sec. 36.
The legislature did not repeal or amend the relevant portion of 17-273 relied upon by the court in rendering its 1989 decision. That decision is subject to the extensive limitations inserted by Public Act 92-16. It should remain viable, subject to those limitations, and enfeebled as the defendant City proclaims. The Compliance Plan is to be modified consistent with this decision.
Conclusion
The defendants' motion to reconsider is denied except as Public Act 92-16 may bear upon the Compliance Plan.
The plaintiffs' prayer for relief in the form of a request for a finding that shelter is a constitutional right in Connecticut is denied.
Anthony V. DeMayo, Judge